**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| Joy Calloway-Vann, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Transport Workers Union of America, | ) |
| | ) |
| Defendant. | ) |

JUDGE HOLDERMAN

**Jury Demanded**

02C 0464

DOCKETED
JAN 2 2 2002

MAGISTRATE JUDGE KEYS

**COMPLAINT**

### Introduction

1.      Plaintiff Joy Calloway-Vann seeks damages and injunctive relief against the defendant union and its officers for a conspiracy and campaign to destroy her career as a union officer because of race and sex and then to suspend her from union membership, in violation of 42 U.S.C. § 1981 and Section 101 of the Labor Management Reporting and Disclosure Act (LMRDA). In addition, she alleges that defendant union and its officers have engaged in the same acts because of her exercise of her right to speak and assemble and sue her labor organization, in violation of Sections 101 and 609 of the LMRDA.

### Parties

2.      Plaintiff Joy Calloway-Vann is an Illinois resident and the former president of TWUA Local 512 which has its headquarters in Elk Grove Village, Illinois.

3.      Defendant Transport Workers Union of America (TWUA) is a national labor organization within the meaning of Section 2 (i) of the LMRDA and is doing business in Illinois and represents hundreds of members in this judicial district.

**Jurisdiction**

4.      The jurisdiction of this Court is based on 28 U.S.C. § 1331 and § 1343 and on Section 102 of the LMRDA, 29 U.S.C. § 412.

5.      Venue lies in this judicial district because plaintiff and defendant union does business here and the cause of action arose here.

**Facts**

6.      In 1997, Joy Calloway-Vann, a long time member of Local 512 of the TWUA, was elected as vice president of the local.

7.      In 1998, the president, a white male, resigned.

8.      Succeeding to the presidency, Joy Calloway-Vann became the first African American woman to serve as Local 512 president.

9.      Historically, the president of Local 512, like presidents of other TWUA locals in the airline industry, had always been males.

10.      Not a single one of the 16 locals in the Air Traffic Division or ATD, which was then headed by Ed Koziatek, had ever had a female or female African American in such a position.

11.      When Calloway-Vann  assumed her office as president, Koziatek's assistant at the ATD was John Orlando, who like Koziatek, held the national office of TWUA vice president.

12.      In addition, Orlando was the national union's liaison to Calloway-Vann and other local officers.  In this capacity he represented the views of, and acted in behalf of, Koziatek and Sonny Hall, the president of the TWUA.

13.      At various times and places, and in the presence of TWUA officers, Orlando said words to the effect:  What am I going to do with a woman president, and a Black one at that?

14.     Orlando expressed the same question in similar words or phrases on several or more occasions, and in a few cases would then address to her the following words, exactly or to the effect:  You think you can handle it?  or:  You can always quit, you know.

15.     After Orlando swore her in as president, he made a practice of coming to the local meetings, as if to check on the ability of a woman, and a Black person, to run the meetings of Local 512.

16.     On one occasion, when she requested the purchase of a chair, he said, in front of various TWUA members, "Yeah, let her get a chair, a big fat woman's chair," and he repeated a remark to this effect at other times.

17.     When Calloway-Vann had to contact Orlando for various matters, Orlando often failed to answer her, until a male was on the phone with Calloway-Vann.

18.     Calloway-Vann repeatedly complained of Orlando's racist and sexist remarks to Koziatek and Hall.

19.     Neither Koziatek nor Hall rebuked or reprimanded Orlando officially, and took no corrective action of any kind, and told Calloway-Vann "not to pay  attention" to Orlando's repeated slurs at union meetings.

20.     Nonetheless, although Calloway-Vann complained, Koziatek and Hall kept Orlando in place as the national union's liaison with Calloway-Vann.

21.     Furthermore, Orlando chaired the majority of the meetings of the Presidents' Council, which consisted of  the sixteen local union presidents in the ATD.

22.     When Calloway-Vann raised her hand to speak at such meetings, Orlando would typically ignore her, and call on any white male officer instead.

23.     While Orlando was supposed to be the liaison from Sonny Hall and Koziatek, he

often gave official union-related information to Rick Rodriguez, one of Calloway-Vann's opponents, rather than to Calloway-Vann herself.

24.     By complaining to Koziatek and Hall, Calloway-Vann achieved nothing except to isolate herself even more from Orlando and other white male officers.

25.     Furthermore Calloway-Vann complained that there was not a single Black member who held any staff position of any kind in the TWUA's ATD division, and thereby further antagonized defendants.

### The First TWUA Trusteeship

26.     In 1999, responding to the concerns of white male mechanics, the TWUA conducted an election in which only the mechanics (overwhelmingly white males) could vote to secede and set up their own local.

27.     The fact that Calloway-Vann was a Black and female was a factor in the decision of the mechanics to seek their own local

28.     No other members, especially the largely minority members of other ATD divisions, were allowed this right to secede.

29.     Furthermore, to show disrespect for Calloway-Vann, the TWUA brushed aside Calloway-Vann's administration, and proposed to conduct directly an election involving only the mechanics of Calloway-Vann's local union, without her participation or that of any other TWUA rank-and-file members.

30.     While Calloway-Vann did not wish to force the white male mechanics to stay if they wished to go, she objected to the TWUA stepping in and conducting directly such an election, as if the local union already did not exist.

31.     Accordingly, in <u>Fields et al. v TWUA et al. 99 C. 4185</u> (N.D. Ill. U.S.D.C.)

filed in a court of this district, Local 512 and Calloway-Vann and various rank and file members

brought a suit under Title III of the LMRDA to stop the TWUA from conducting such an

election.

32.     While a formal preliminary injunction was not entered, Magistrate Judge Morton

Denlow set the matter for an expedited trial on the merits and prevented the TWUA from

conducting an immediate election for the mechanics.

33.     Subsequently, the TWUA entered a settlement agreement with Calloway-Vann

and Local 512 that allowed the local union a role in the conduct of the election.

34.     Nonetheless, both Hall and Koziatek-- and Frank McCann, another TWUA Vice-

President-treated Calloway-Vann in an abusive manner during the pendency of the litigation.

35.     For example, Koziatek would not permit Calloway-Vann to speak at the meetings

of the Presidents' Council, and thereby stigmatized her and showed other local presidents what

would happen if they sought to assert their rights under the LMRDA.

36.     Jim Little, a TWUA vice president, sent an email stating that, as a result of filing

the Fields et. al., v. TWUA, case under the LMRDA, Calloway-Vann should be brought up on

internal charges.

37.     In further retaliation against Calloway-Vann for exercising successfully her rights

under the LMRDA, and because she was black and female, the TWUA national union took the

extraordinary step of intervening in the upcoming union officer election of Calloway-Vann's

Local 512 and demanding the authority of directly conducting the election of officers including

Calloway-Vann.

38.     The TWUA gave Local 512's Executive Board an ultimatum that instead of the

local union election committee, a three member panel led by Calloway-Vann's political

opponent, Koziatek, a TWUA officer, would conduct the election.

39.     While ostensibly supervising the election as a neutral, Koziatek actually recruited the opposing slate to run against her and in fact it did run.

40.     The election which Koziatek conducted was a travesty, in that Koziatek approved a new format ballot that was profoundly confusing. Members who wished to vote for Calloway-Vann's slate ended up voting for her opponent's slate, the slate of Rick Rodriguez.

41.     The box for the opposing slate was placed next to Calloway-Vann's name so that it appeared to be the way to vote for Calloway-Vann.

42.     The ballot format was so obviously misleading that even Koziatek agreed to post a notice to explain which box belonged to which slate.

43.     Local 512 elections are customarily conducted by mail.

44.     By the time Koziatek posted the notice on the membership bulletin board, most of the mail ballots had been mailed and returned.

45.     As a result of Koziatek's actions as described above, Calloway-Vann lost the election.

### The Suspension From Membership

46.     With the approval of Hall and Koziatek, the new local officers installed in February 2000 immediately began a process to suspend the membership of Calloway-Vann, so that she could not run in the next election three years away.

47.     Ten charges were brought against Calloway-Vann by her political opponents.

48.     The new officers set up a Trial Committee of three members whom they personally picked.

49.     The Trial Committee announced without explanation that Calloway-Vann was

guilty of eight of the ten charges.

    50.    All eight of the charges on which she was found guilty were in fact baseless, and

provided no justification whatever for suspending her from union membership.

    51.    Plaintiff has attached as Exhibit A hereto a letter from plaintiff's counsel to the

general counsel of the TWUA that describes each charge, and why there was no evidence in each

case of any wrongdoing by plaintiff and incorporates the entire letter by reference as follows and

sets out the gist of the letter detailing the charges and Calloway-Vann's responses:

| | |
|---|---|
| **Charge No. 1:** | She signed a check authorizing "lost time" for two days of work to Marcus O'Neal. O'Neal had put in a "U.B." slip giving different dates for the lost time. |
| **Response:** | O'Neal testified that he made a typographical error. Joy Calloway-Vann would not have been in a position as president to catch such an error. (Indeed, the union's accountant and financial secretary did not catch the error). It was absurd to hold Calloway-Vann guilty of anything on such a charge. |
| **Charge No. 2:** | O'Neal also put in (for Al George) a UB slip that gave a different date than the date for which the Local paid George for "lost time." |
| **Response:** | Again, Calloway-Vann who simply countersigned the check to George would have been in no position to catch the error. In any event, it was a typographical error, and no funds were lost. It was again absurd to hold Calloway-Vann guilty of anything. |
| **Charge No. 3:** | Al George was alleged to have taken "lost time" improperly for four days in December 1999. First, it was admitted by the charging party that Al George <u>did</u> work four days for the local union on local union business. He worked on an arbitration case during that time. The charge was that he had received vacation money from American Airlines for this same period. |

| | |
|---|---|
| **Response:** | <u>That</u> vacation money was not for the days taken off in December 1999 but for unpaid vacation earned in 1998. Such lost-time compensation under these circumstances as therefore proper. Even now, the Local has not requested Mr. George to repay any lost time, nor could it legitimately do so. So it is absurd to hold Joy Calloway-Vann guilty here as well. |
| **Charge No. 4:** | The Board approved payment of $540 to each Board member for a one time payment for the use by the Board member of cell phone, gasoline, phone at home, etc. An accountant advised that this single one time uniform reimbursement was a proper expense reimbursement. The charging party did not challenge the propriety of the act as such, but only that one of the persons paid was Keith Larson, who was not a Board member but a Section Chairmen. But the Board chose to give Larson the payment because, alone among the Section Chairman, Larson did not have an expense account to use. Since Larson was the only Section Chairman who had not received a stipend previously expenses, the Board reasonably chose to give him a $540 check along with the checks to each of the Board members. It was reasonable. Finally it was the Board, not Joy Calloway-Vann, that approved this action. . It was absurd to find <u>her</u> guilty on such a trumped up charge, since she is governed by the Board's decision. |
| **Charge No. 5:** | She was found not guilty of sending flowers to deceased and sick union members and family. |
| **Charge No. 6:** | She was found guilty of going to Detroit on October 22 to October 25, 1998 on union funds not for legitimate union business but to attend a birthday party for her daughter. In fact she went to Detroit for an Employee Assistance Program issue, at the request of the Local 521's former Vice President. She presented a birth certificate of her daughter's birthday which is <u>December 1.</u> |
| **Charge No.7:** | The charging party claimed that in connection with the Local's Christmas party, "Joy Calloway-Vann received "two checks from the Local" funds but "at no time in |

1998 or 1999 did (she)..... provide the Local with any receipts for the items she may have purchased" for the so-called "party."

**Response:** This is a complete misstatement of what happened. First, as president, she did not receive _any_ money from the Local. Rather, members and non-members made donations to the Local's toy drive. Some of the personal checks were made payable to the Local. In the case of these checks, Joy Calloway-Vann and the financial secretary had the checks cashed. The proceeds were spent on the toys and hats and gloves and clothing for the children. No Local funds were used. Furthermore, Calloway-Vann and Sheila Hilton (the recording secretary's wife) did turn in receipts for the purchase of the toys and clothing. Marcus O'Neal testified, without contradiction from anyone, that Joy Calloway-Vann did turn in the receipts. There is no basis on which she could be found liable on this charge.

**Charge No. 8:** Here the charging party claims that Marcus Neal was improperly reimbursed for the purchase of a suit in the amount of $277.50.

**Response:** The Kansas City downline station of Local 512 make an emergency request to send a Local 512 officer down to co chair a meeting to start the next morning. Marcus Neal was in charge of the Kansas City station, and was sent directly from the office.
He had no opportunity to go home and get a suit. The reason he was sent in a rush was to get a free flight on American Airlines! If he had gone home to get proper clothing, he would have missed the free flight, sometime available from American Airlines in such and the Local would have had to pay approximately $500 for a regular flight. It seemed cheaper to let Mr. Neal go immediately, get the free flight, and be reimbursed for a suit of clothes, at a savings of $200 or more to the Local. At any rate, this is what the Executive Board voted to approve. It is absurd and improper to convict Joy Calloway-Vann on a matter

approved by the Board as a way to save money and avoid paying full fare for an emergency flight.

**Charge No. 9:** Found not guilty.

**Charge No.10:** The charging party claimed that Joy Calloway-Vann had used the postal meter to send "personal" mail on five occasions. On two occasions, the Trial committee found that she was <u>not</u> guilty.

**Response:** As to the other three, she reimbursed the Local by taking money out of her purse and paying the amount owed to petty cash. Al George testified that she paid the money to petty cash. The total involved was under $40. Again, there was no evidence to convict her.

52.     Virtually all the charges described above related to small items of expenditure, and in each case she showed that she was guilty of no wrongdoing.

53.     The panel did not and made no attempt to document its findings and conclusions.

54.     The panel recommended that Calloway-Vann be barred from union membership "for no less than one year and a maximum of three years" and "that Ms Calloway-Vann and Mr. Neal be required to repay any monies and return any properties owed to TWUA Local 512 arising from all charges to which they have been adjudged to be guilty."

55.     The Executive Board, composed of Calloway-Vann's political rivals chose to suspend her for the full three years.

56.     By choosing the "maximum," the Executive Board members made sure that Calloway-Vann would not be able to run against them in the next election.

**TWUA's Endorsement of the Discipline**

57.     Subsequent to this decision, Calloway-Vann sought to exhaust her internal remedies, and avoid litigation because the charges against her were so transparently specious and

lacking in evidence.

58. On January 30, 2001, the International Appeals Committee, headed by Calloway-Vann's fierce opponent, Frank McCann, upheld the suspension and denied her appeal.

59. By letter of January 31, 2001, Sonny Hall offered Calloway-Vann the opportunity to appeal her suspension to the convention, which was to be held in Las Vegas, Nevada, on October 19, 2001.

60. However, in violation of basic due process, Hall wrongfully and maliciously refused to let Calloway-Vann attend the Convention, to present her appeal.

61. By keeping Calloway-Vann from presenting her case to the delegates, TWUA interfered with her right to exhaust her remedies in a discriminatory manner.

62. A week prior to the start of the Convention, the Executive Board of TWUA met to consider the various appeals, including Calloway-Vann's.

63. Calloway-Vann's appeal was assigned to be heard by a hearings panel whose chair and members would be picked by Hall.

64. Incredibly, the panel picked to hear Calloway-Vann's appeal, was chaired by ... John Orlando!

65. Orlando's panel denied Calloway-Vann' appeal.

66. Orlando's panel oversaw the expulsion of two other prominent African American officers, including Corinne Mack, vice-president of Local 100, the largest local in the TWUA, and Willie James, the president of Local 100.

67. Orlando, who is openly racist and known to be so by Hall and Koziatek, was selected to ensure the policy of the TWUA leadership of removing African American officers.

68. As a result of TWUA's endorsement of her suspension, Calloway-Vann also can

no longer serve on the TWUA Executive Council, where she could continue to oppose Hall and the racially and sexually hostile policies of the TWUA leaders.

69.     Plaintiff has now exhausted her internal remedies within the meaning of Section 104 of the LMRDA, 29 U.S.C. § 412.

### Count I

### (Violation of LMRDA)

70.     Plaintiff incorporates paragraphs 1 through 69 by this reference.

71.     By the aforesaid acts, defendant TWUA, has acted to deny plaintiff her right to

(1)     to have equal rights and privileges and be free from discrimination based on race and sex in her conduct both as a local union officer and as member, as provided by LMRDA section 101(a)(1),

(2)     express her views politically as a member and officer without reprisal or without loss or suspension of her union membership, as provided by LMRDA Section 101(a)(1),

(3)     to meet and assemble with opponents of the incumbent officers without reprisal or without suspension or loss of her membership, as provided by LMRDA Section 10l(a)(2), and

(4)     to file or institute a legal action against her union without reprisal or loss of her union membership, as provided by LMRDA Section 101(a)(4), when she has previously exhausted her internal remedies or had no need to do so,

72.     Furthermore, by the aforesaid acts, and by suspending her from union membership for a three year period, defendant TWUA, has suspend her for exercising rights to which she is

entitled under the provisions of Sections 101 and 102, and thereby have violated the provisions

of LMRDA Section 609, 29 U.S.C.§ 529, which prohibits such discipline by a labor

organization.

WHEREFORE, plaintiff prays this Court to:

A.     Grant her compensatory damages for all injury, including emotional distress and

humiliation, arising from the aforesaid violations,

B.     Order her reinstatement to union membership, and her reinstatement as Vice

President of TWUA.

C.     Enjoin defendant TWUA from future acts of reprisal and retaliation and disparate

treatment of plaintiff in her exercise of rights under Sections 101 and 102 of the LMRDA

D.     Grant her punitive damages.

E.     Grant her legal fees and such other relief as may be requested.

## Count II

### (Section 1981)

73.     Plaintiff incorporates paragraphs 1 through 72.

74.     By virtue of the Constitution of the TWUA, the plaintiff has a contractual right to

union membership.

75.     As a union member, the plaintiff has a contractual relationship with defendant

TWUA, and has a right to be free of racial discrimination in the formation of and performance of

such contractual relationships, under Section 1981 of Title 42 of the United State Code.

76.     By the aforesaid acts, defendant TWUA has violated plaintiff's right to be free of

racial discrimination in the formation and performance of such contractual relationships, as

guaranteed by Section 1981 of Title 42.

WHEREFORE plaintiff prays this Court to:

A.     Grant her compensatory damages for the loss of her union office and suspension from union membership because of racial discrimination.

B.     Grant her punitive damages for the loss of her union office and suspension from union membership because of racial discrimination.

C.     Enter an injunction against TWUA to prevent racial discrimination in the treatment of all persons of color who hold any union office in the Air Traffic Division of the TWUA.

D.     Grant plaintiff her legal fees under Section 1988 of Title 42.

By:     _____

One of the Attorneys for Plaintiff

Despres, Schwartz & Geoghegan
77 W. Washington St., Suite 711
Chicago, IL 60602-2803

John T. Moran, Jr.
309 W. Washington Street, Suite 900
Chicago, IL 60606
Attorneys for Plaintiff

JS 44
(Rev. 12/96)

CIVIL COVER SHEET

DOCKETED

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)  Jan 22, 200

## I. (a) PLAINTIFFS

Joy Calloway-Vann

JUDGE HOLDERMAN

MAGISTRATE JUDGE KEYS

**DEFENDANTS**

Transport Workers Union of America

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  DuPage
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Thomas H. Geoghegan
Despres Schwartz & Geoghegan
77 West Washington Street, Suite 711
Chicago, IL 60602

ATTORNEYS (IF KNOWN)

**02C 0464**

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motion to Vacate Sentence | ☒ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

Under 29 U.S.C. Sections 411 and 529 and 42 U.S.C. Section 1981, Plaintiff sues Union for her suspension from union membership.

## VII. REQUESTED IN COMPLAINT

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND: ☒ YES ☐ NO

## VIII.

This case ☒ is not a refiling of a previously dismissed action.
☐ is a refiling of case number _____, previously dismissed by Judge _____

DATE
1-18-02

SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT

**United States District Court**

NORTHERN DISTRICT OF ILLINOIS

Eastern Division

DOCKETED
JAN 2 2 2002

JUDGE HOLDERMAN

In the Matter of

Joy Calloway-Vann

v.

Transport Workers Union of America

MAGISTRATE JUDGE KEYS

Case Number:

**02C 0464**

AN ADDITIONAL APPEARANCE IS HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY FOR:

Joy Calloway-Vann

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Thomas H. Geoghegan | NAME John Thomas Moran, Jr. |
| FIRM Despres Schwartz & Geoghegan | FIRM John T. Moran & Associates |
| STREET ADDRESS 77 West Washington Street, Ste 711 | STREET ADDRESS 309 West Washington Street, Suite 900 |
| CITY/STATE/ZIP Chicago, IL 60602 | CITY/STATE/ZIP Chicago, IL 60606 |
| TELEPHONE NO. 312/372-2511 | TELEPHONE NO. 312/630-0200 |
| MEMBER OF TRIAL BAR? ☒ Yes ☐ No | MEMBER OF TRIAL BAR? ☒ Yes ☐ No |
| TRIAL ATTORNEY? ☒ Yes ☐ No | TRIAL ATTORNEY? ☐ Yes ☐ No |
| | DESIGNATED AS LOCAL COUNSEL? (SEE ITEM 6 ON REVERSE) ☐ Yes ☐ No |
| (C) | (D) |
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NO. | TELEPHONE NO. |
| MEMBER OF TRIAL BAR? ☐ Yes ☐ No | MEMBER OF TRIAL BAR? ☐ Yes ☐ No |
| TRIAL ATTORNEY? ☐ Yes ☐ No | TRIAL ATTORNEY? ☐ Yes ☐ No |
| DESIGNATED AS LOCAL COUNSEL? (SEE ITEM 6 ON REVERSE) ☐ Yes ☐ No | DESIGNATED AS LOCAL COUNSEL? (SEE ITEM 6 ON REVERSE) ☐ Yes ☐ No |

*PLEASE COMPLETE IN ACCORDANCE WITH INSTRUCTIONS ON REVERSE.*

1-3